Date signed August 26, 2011



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| 207 Redwood Street LLC, | * | Case No. 10-27968-NVA |
| | | (Chapter 11) |
| Debtor | * | |
| * * * * * * * | | |
| RL BB Financial LLC, | | |
| | * | |
| Movant, | * | |
| v. | * | |
| 207 Redwood Street LLC, | * | |
| Respondent. | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING MOTION OF
RL BB FINANCIAL LLC [dkt. 63] FOR RELIEF FROM THE AUTOMATIC STAY**

The Court has before it the Motion [dkt. 63] filed by RL BB Financial LLC (the "Lienholder") for Relief from Automatic Stay of § 362 of the Bankruptcy Code, title 11 of the United States Code (the "Bankruptcy Code"). Based on the evidence presented at a hearing and

the record in this case, the Court has determined that the Lienholder has failed to carry its burden to show that cause exists for this Court to grant relief from the automatic stay.

## A.   Background

The debtor, 207 Redwood, LLC (the "Debtor") owns a parcel of real property located at 207 Redwood Street in downtown Baltimore, Maryland (the "Property"). The Property is a building formerly used as office space that was purchased by the Debtor with the intent of building and operating a hotel. All parties are in agreement that the Property is possessed of architectural charm, is aesthetically appealing and appropriate for an upscale boutique-style hotel. The Debtor is in communications with International Hotel Group ("IHG"), an international hotel owner and operator, which reportedly has expressed interest in branding the Property as a Hotel Indigo and operating it under the Hotel Indigo flag.

The Lienholder filed its Motion for Relief from Stay [dkt. 63], seeking to avail itself of its state-court rights in order to foreclose on its indebtedness and lien.[1] The Lienholder asserts that cause exists to grant relief from the automatic stay because the Property was sold at a tax sale in May, 2010 and the Debtor needs $304,738.91 to redeem the Property. This amount continues to accrue interest at 18%. In addition to this accrued tax debt, the Lienholder points out that the Debtor is not making current tax payments to the taxing authority. The Lienholder also argues that the Debtor has no employees, there is no equity in the Property, no work has been done on the Property for two years and no payments have been made to the Lienholder.

---

[1] Pursuant to a Stipulation of Fact [dkt. 115] filed by the Lienholder and the Debtor, Branch Banking & Trust ("BB&T") extended a loan to an affiliate of the debtor in the amount of $16,300,000 for the purpose of converting the Property to a 130-room hotel. The loan is evidenced by a promissory note dated December 21, 2007, guaranteed by the debtor and secured by an indemnity deed of trust. The Debtor valued the Property as of the Petition Date at $14.5 million.

Further, the Lienholder argues that the Debtor has no reasonable prospect of confirming its plan of reorganization in a reasonable amount of time.

The Debtor asserts that the value of the Property and the amount of claim of the Lienholder were each approximately $14 million at the time of the filing of this case.[2] Because of the decline in the value of commercial real estate, the Debtor conceded (in argument, not evidence) that the value of the Property may now be worth somewhat less than the Lienholder's claim which is in the stipulated principal amount of $14,197,840.36.[3] (This stipulated claim amount is less than the Lienholder's proof of claim which is in the amount of $15,582,494.37.) *See* proof of claim no. 16 filed December 14, 2010.

The Debtor also asserts that it has funding in place to finish the repairs and renovations on the Property, to redeem the tax sale debt and to pay the accrued interest. The Debtor has proposed a plan of reorganization to this effect, and contemplates a branding and management contract with IHG. The Debtor maintains that once its proposed plan is confirmed, it is no more than six months away from being able to open the Property as a hotel.

The Debtor offered into evidence a list of items IHG has proposed are necessary to complete the hotel (admitted for the limited purpose of showing that the Debtor is working with IHG and moving forward), *see Debtor's Exhibit 4*, a critical path analysis from IHG (admitted for the same limited purpose as Exhibit 4), *Debtor's Exhibit 5*, correspondence showing dialogue

---

[2] The Debtor valued the Property on its Schedule A as $14.5 million.

[3] The original lender was Branch Bank & Trust which made a loan secured by the Property in the principal amount of $16.3 million. See Stipulations of Fact [dkt. 115]. After the Property went into foreclosure, the Note and Deed of Trust securing the Property were purchased by the Lienholder. *See Lienholder's Exhibits A - D.*

with IHG food and beverage department (admitted for the same limited purpose as Debtor's Exhibit 4), and *Debtor's Exhibit* 6.  The Debtor produced an unexecuted (by IHG) non-binding letter of intent with IHG to manage the operations of the hotel.  *See Debtor's Exhibit 10.*  IHG was not called to testify at the trial on this matter and was not in the courtroom.

## B.    Condition of the Property

At the hearing on this matter, the Debtor called Ms. Siu Loong Cheung, the current property manager.  Ms. Cheung is an investor in the group that owns the Property and until recently, she was only a passive investor.  However, after some setbacks suffered by the Debtor while under prior management, Ms. Cheung determined that she needed to play a more active role in the Property.  Since October, 2010, Ms. Cheung has been the principal representative of the consortium of family investors that has invested in this Property.  Ms. Cheung's investor group is also involved in plans to renovate and rehabilitate an additional property that is currently the subject of another bankruptcy case before this Court.[4]  The Court is impressed with Ms. Cheung's dedication to this project as well as her business experience and successes.

The parties agree that the Property is at least 90% renovated and not much more work remains to be done in order to get the Property prepared to open and operate as a hotel.  Ms. Cheung gave an estimate of approximately $1.8 million for the hotel decor (which she believes may have dropped to about $1.5 million given declining prices) and an estimate of about $800,000 to complete the construction.

As planned by Ms. Cheung and her group (*i.e.*, the Debtor)  the hotel will have 130 guest rooms, a restaurant, a fitness room, a boardroom and a snack shop.  A contractor who specializes

---

[4] *See In re 101 Charles Street, LLC*, case no. 10-27966 (Bankr.D.Md. 2010).

in hotel construction has been selected to complete the final buildout, but a written estimate for the work has not been done. The contractor needs $51,000 to complete the estimate because all systems in the building need to be turned on and a full complement of workers needs to be on site for three weeks in order to prepare the detailed estimate. Ms. Cheung has not wished to spend this money until sure that the Property would not go to foreclosure. Although it has not prepared a line-by-line estimate, the construction company has provided a rough, non-binding estimate of approximately $800,000 for the completion of construction.

Ms. Cheung has met with IHG representatives and has walked with them through every floor and almost every room. Representatives from IHG have shared with her what absolutely needs to be done prior to opening, what they would like to see done and what they are flexible about. Ms. Cheung also has met with an architect and an interior designer with respect to the project.

Ms. Cheung's communications with IHG have been active and the parties have discussed branding the project as a Hotel Indigo. Hotel Indigo is a brand that is owned by IHG, that is situate in the hotel market above Holiday Inn and below Crowne Plaza. There is no other Hotel Indigo in the Baltimore area. Ms. Cheung contemplates that IHG will manage the completed hotel, assist in hiring and provide support for the grand opening.

Ms. Cheung prepared a thorough and detailed budget for the Property that assumes that the hotel is open and operating. The Court is impressed with the level of detail and expertise that went into the preparation of the budget. Although the Lienholder has disparaged Ms. Cheungs' expertise in hotel ventures she has significant hospitality experience and the proficiency and detail of the budget she presented speaks well for her management, accounting and organizational abilities. *See* Debtor's *Exhibit 17*.

Of the remaining construction costs, a significant portion of the funds needed will go to replacing an elevator at a cost of approximately $40,000. In addition, the hotel needs carpet from the 7th to the 10th floor and the restaurant buildout must be completed. Without knowing the exact construction projects that need to be completed, Ms. Cheung was unable to give an exact timeline for getting the hotel opened. She believes construction would take about three months to complete once actually started. Ms. Cheung testified an additional one to three months would be needed to market the property after completion of the construction. Accordingly, Ms. Cheung estimates that it would take about three to six months to get to the grand opening.

Ms. Cheung testified that the Debtor had sufficient funding available to cover the costs of construction, interior decorating, a grand opening and to get the Property operational. Ms. Cheung testified that the $3.5 million is comprised of $1.55 million of existing funds and that the rest of it is available under a commitment letter. The Lienholder pointed out that the commitment letter upon which Ms. Cheung relies has expired, and the Lienholder raised a question as to Ms. Cheung's ability to renew that commitment.

The commitment letter was issued by CW Cobb and Associates and is addressed to Ms. Kwen L. Cheung, Ms. Cheung's sister. *See Debtor's Exhibit 3.* In the letter, CW. Cobb has committed to lending funds to be secured by a shopping center owned by Ms. Cheung's sister. Ms. Cheung testified that the funds are still available and that the commitment letter will be re-issued upon her request.

At the hearing, the Lienholder raised issues about the condition of the Property, particularly water damage. Ms. Cheung admitted that something had occurred at the Property that had caused water damage previously, and she believed it was a either a pipe burst or a

pinhole leak. In other words, it was something that had been undetectable in advance and did not demonstrate neglect of the Property. She also believed that the problem had arisen before she took over management and is now abated.

Mr. Dean DuBois, an expert witness called by the Lienholder to testify about the current physical condition of the Property, had visited the Property in March, 2011. He is a project manager for construction management and development and a licensed architect in the State of Arkansas. Mr. DuBois was qualified as an expert in the field of construction management and was a credible witness. His testimony tended to corroborate some of what Ms. Cheung had said.

Ms. Cheung testified that she told Mr. DuBois in March, 2011 that there was a lot of water in the basement. She believes that the water may have risen as high as five feet at some point. She thought that perhaps the sump pump was not operating properly and that perhaps some other mechanisms were not functioning.

Mr. DuBois saw some evidence of past water damage but he could not determine the cause. He did not see any evidence of current water damage, but he could not definitively rule it out. He did see some buckling of floor material on the first and second floor guest rooms where the standing water had been, and some evidence of past water damage to the drywall.

Mr. DuBois emphasized that he has not made an assessment, other than visual, as to the state of the Property and its systems. He believes that there could be some damage to the "switch gear" equipment because of the reported amount of standing water, which could mean that the electrical systems at the Property have been compromised. According to Mr. DuBois, the cost to replace a switch gear is approximately $10,000.

Ms. Cheung admitted and Mr. DuBois confirmed that there is no current air circulation at the Property. Mr. DuBois he did not see an air handling system in place, but confirmed that the

lack of air circulation has not yet caused any physical damage to the Property. Over time, however, the lack of air circulation could become a problem.

The Lienholder raised a concern about mold, given the existence of water damage. Mr. DuBois testified that there is no evidence of mold at the Property. Ms. Cheung, who visits the Property every week and during each weekend, has not seen any mold at the Property. It appears to the Court that Ms. Cheung is vigilant and conscientious about to monitoring the Property and its condition. She stresses that it is not in her best interest to allow the condition of the Property to deteriorate because she and her family members are existing investors and are committed to investing more money to upgrade the Property.

### C. Bases for Seeking Relief from the Automatic Stay

The Lienholder seeks relief from the stay under three subsections of § 362 (d) - - (d)(1), (d)(2) and (d)(3). The subsections of 362(d) are written in the disjunctive; the Court must lift the stay if the Lienholder prevails under any of the three grounds upon which it moves. *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001); *In re Elmira Litho, Inc.,* 174 B.R. 892, 900 (Bkrtcy.S.D.N.Y.1994). The burden of proof on a lift stay motion requires an initial showing of cause by the movant. Section 362(g) places the ultimate burden of proof on the debtor for all issues other than the debtor's equity in property. *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir.1990).

The Lienholder argues that cause exists under § 362 (d) (1) because the Lienholder's claim it is not adequately protected. Alternatively, the Lienholder argues that it is entitled to relief from stay under § 362 (d) (2) because there is no confirmable plan is prospect. Finally, the Lienholder argues that it is entitled to relief from stay pursuant to § 362 (d) (3) because this is a single asset real estate case as that term is defined in § 101 (51B). A creditor whose claim is

secured in single asset real estate may be entitled to stay relief unless the creditor is receiving monthly payments or the debtor has filed a plan of reorganization "that has a reasonable possibility of being confirmed within a reasonable time."  *See* § 362 (d) (3) (A-B) of the Bankruptcy Code.  The Lienholder's entitlement to relief under each of these subsections will be addressed seriatim.

As the party seeking relief from the stay, the Lienholder bears the initial burden of showing that cause exists to modify the stay.  Only if the Lienholder is able to make this initial showing does the burden then shift to the party opposing the relief from stay.  *In re Enron Corp.*, 306 B.R. 465 (Bankr. S.D. N.Y. 2004).  Once the Lienholder fulfills its initial burden, the ultimate burden shifts to the non-movant Debtor to demonstrate why the stay should remain in place.  *In re Busch*, 294 B.R. 137 (B.A.P. 10th Cir. 2003).

### *(I)      Entitlement to Relief Under § 362 (d) (1)*

Section 362 (d) (1) of the Bankruptcy Code provides that a movant is entitled to relief from the automatic stay for "for cause, including the lack of adequate protection of an interest in property.." *See id.*  The Lienholder argues that cause exists because its interest is not adequately protected.  The determination as to whether the stay should be lifted is within the discretion of this Court.  *In re Robbins*, 964 F.2d 342 (4th Cir. 1992).  Because "cause" is not defined in the Bankruptcy Code, the Court must determine what constitutes cause on a case-by-case basis.  *Id.*  To do this, the Court is tasked with balancing the competing interests and the prejudice to the parties.  *See*, *e.g.*, *Sonnax, supra.*

The parties are in agreement that there have been no post-petition payments to the Lienholder.  Currently, the Property is vacant, approximately 90% renovated and not yet capable

of producing income. The Debtor has no employees. No work has been done on the Property since 2009 and the Debtor has not opened a debtor-in-possession bank account. Moreover, the Property was sold at tax sale and the amount needed to redeem the tax lien certificate is approximately $300,000. *See Lienholder's Exhibit F*. This debt is accruing interest at the rate of 18%. Because this is a priority tax debt, the Lienholder argues that it primes the Lienholder's position and cuts into its equity in the Property. The Property is insured.

The Court does not find that the condition of the Property and its potential to deteriorate leaves the Lienholder in a precarious position such that it is not adequately protected. To the contrary, the Court believes that Ms. Cheung is capable and vigilant and responded appropriately to a prior water incident that she did not cause and that could not have been prevented. In an abundance of caution, Ms. Cheung's brother replaced the sump pumps at the Property at his own personal expense. Though it appears that there may be some incidental damage from the pipe burst, there no continuing damage is evident and the issue appears to be resolved.

Ms. Cheung's estimate to finish the construction and upgrades on the Property was a ballpark estimate based on her dealings with her contractor and her interior designer. The Lienholder was not satisfied with these estimates but did not have evidence of its own to proffer to contest them. The Lienholder argued that the Debtor's evidence was deficient because there is no firm estimate of costs to complete and posits that the Debtor is dragging its feet in getting a final estimate  Ms. Cheung testified that it would cost approximately $51,000 for a construction estimating/mechanical engineering firm to go through the building and give a line-by-line estimate of all of the work that needs to be done to get the Property in condition to open. The Lienholder believes that the Debtor is in dereliction of its obligations for not yet having undertaken this process, and argues that because the Debtor has failed to undertake this process,

the Debtor does not have a real grasp on the exact costs to complete the project. The Court found Ms. Cheung to be credible in her explanation regarding her estimates and the reason that the Debtor has not yet obtained a line-by-line estimate. The Court expects that the Debtor will obtain an appropriate estimate of each cost to complete the Property prior to the construction beginning in earnest.

The Lienholder did not enter any controverting evidence of repair, renovation or design costs. The evidence that the Debtor presented was useful, if not definitive, with respect to the costs that would be involved to upgrade, renovate and repair the Property such that it could be operated as a hotel.

There was credible evidence that sufficient funding exists to enable the Debtor to get to opening. Ms. Cheung testified that the Debtor has $3.5 million available for the repair, renovation and upgrade of the Property.[5] This is an amount sufficient to redeem the tax debt of $300,000, pay for the line-by-line estimate of $51,000, make repairs and complete construction if that figure is at or near the estimated amount of $800,000, purchase interior furnishings in the amount of approximately $1.5 million and still have sufficient funds to account for interest on the taxes, some unexpected construction costs and additional costs associated with the grand opening. The Court found credible Ms. Cheung's testimony that the lender, CW. Cobb and Associates, would re-issue the $1.55 million commitment upon request.

Based on the evidence that construction at the Property is about 90% complete, the estimate of cost, the Debtor's timeline, and the evidence that the Debtor has sufficient funding available, the Court believes that the Lienholder's interest is adequately protected. In addition,

---

[5] Debtor's *Exhibit 3* shows that the Debtor has $3,469,689.81 in available funds from various sources.

even after accounting for the funds to pay for the renovations, the upgrades, the repairs and the decor, there appear to be sufficient funds to redeem the tax certificate and pay the accrued interest in full.

This Property appears to be very close to becoming an income-producing hotel and the Debtor ought to be given an opportunity to see that vision through. The Lienholder will become increasingly protected based on the expectation that the value of the Property will continue to grow as the Debtor improves the condition of the Property. Based on the foregoing factors, the Lienholder is denied stay relief under § 362 (d) (1).

### *(ii) Entitlement to Relief Under § 362 (d) (2)*

Section 362 (d) (2) of the Bankruptcy Code provides that a movant is entitled to relief from the automatic stay if "the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization." *See id.*

Here, if there is a lack of equity, it is slight. The Debtor argued that at the time of the filing of the petition, it believed that the value of the Property was about equal to the amount of the secured claim. Due to the falling value of real estate and the escalation of the amount of the claim, those numbers have fallen out of balance over the course of time. Even so, this does constitute a lack of equity in the Property for the purposes of this subsection. The burden to show lack of equity is squarely on the Lienholder and imputed general knowledge that the commercial real estate market is deteriorating without an appraisal or other evidence of value, is not sufficient to meet this burden. *In re Our Secret, Ltd.*, 282 B.R. 697 (Bankr. D. N.M. 2002) (lienholder failed to carry burden of lack of equity when it failed to introduce evidence of depreciation). *See also, In re Harrington*, 282 B.R. 637 (Bankr. S.D. Ohio 2002) (lienholder failed to show lack of

equity so debtor was not required to make a showing that property was necessary for effective reorganization).

Even though the Lienholder has failed to show lack of equity, the Court will evaluate whether the Property is "necessary for an effective reorganization" in the context of stay relief under section 362 (d) (2). Necessary for an "effective reorganization" does not mean that the Debtor's hoped-for reorganization is based on the ownership of the Property. *See In re Boca Development Associates*, 21 B.R. 624 (Bankr. S.D.N.Y. 1982). To the contrary, "[i]f all the debtor can offer in response to a request for relief from the automatic stay is the hope that sometime in the future some purchaser may appear on the horizon with a sufficiently substantial offer to support a plan of reorganization, it cannot be concluded that an 'effective' reorganization is likely." *Id. citing In re Saint Peter's School*, 16 B.R. 404, 408-409 (Bankr. S.D.N.Y.1982). *See also, In re Terra Mar Associates*, 3 B.R. 462 (Bankr. Conn.1980); *In re Hutton-Johnson Co. Inc.*, 6 B.R. 855 (Bankr. S.D.N.Y.1980); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bankr. D. Conn.1980); *In re Clark Technical Associates, Ltd.*, 9 B.R. 738 (Bankr. D.Conn.1981). As the party seeking to keep the automatic stay in place, the Debtor has the burden to show that an effective reorganization is likely within a reasonable amount of time. *See In re DeLuca*, 194 B.R. 797 (Bankr. E.D. Va. 1996).

The Supreme Court has construed the second prong of (d) (2) as requiring "a reasonable possibility of successful reorganization within a reasonable time" or that a plan "is in prospect." *See United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376 (1988). The Debtor here has carried its burden to show that it has a reasonable possibility of a successful reorganization within a reasonable period of time. The Debtor has mapped out a path to completion and opening of a hotel at the Property and shown the Court each step it plans to take

along the way. While some of the numbers it is working with right now are less firm than others (the line-by-line construction analysis it needs to obtain in the future), there is enough breathing room in its budget to accommodate some unknowns. It makes sense to the Court that the Debtor did not get the $51,000 estimate prior to the hearing on the lift stay. The Debtor has explained its reluctance to expend this amount until it knows there will be no imminent foreclosure. In addition, there was testimony that the detailed estimate would only have a limited life expectancy - - thus, if the contractor were not able to complete the work right away, the estimate would be of limited usefulness and the expenditure of funds may not be in the Debtor's best interest.

This case has been pending for quite some time, and, in general, the longer a chapter 11 case has been pending, the greater the burden is on the debtor to show that its plan is likely to be confirmed in a reasonable amount of time. *See Gunnison Center Apartments*, LP, 320 B.R. 391 (Bankr. D. Colo. 2005) (courts utilize a sliding scale in determining whether a plan is in prospect, and the burden on the debtor is lesser during the 120-day exclusive period). *See also In re Brian Wise Trucking, Inc.*, 386 B.R. 215 (Bankr. N.D. Ind. 2008) (courts use a sliding scale to determine whether a plan is in prospect and "the older the case, the better is has to look."). The Debtor is past the time when it could get over the hurdle simply by showing that a reorganization is "plausible." *Id.* at 403 (toward the expiration of the 120-day period, the burden increases from "plausible" to "probable.")

Based on the evidence presented, the Debtor has carried its burden to show that its reorganization is probable. The biggest obstacle facing the Debtor, other than general unknowns, is the Lienholder. The Debtor has tried to negotiate a consensual, practical solution but the

Lienholder appears to be unwilling.[6]  This Debtor has the funds to make its reorganization happen and has committed investors.  It has an estimated firm time to get to opening day.  The Property is near completion and is, by all accounts, highly desirable.  Based on the evidence presented, the Court concludes that the Property is necessary for an effective reorganization and the Lienholder is not entitled to relief from the stay under § 362 (d) (2).

### *(iii)     Entitlement to Relief Under § 362 (d) (3)*

Section 362 (d) (3) of the Bankruptcy Code is exclusively applicable to single asset real estate ("SARE") cases.  Although legislative history is sparse with respect to this statute (which was enacted as part of the Bankruptcy Reform Act of 1994), Congress was apparently concerned about the relative inequities that exist when a single asset real estate project files for bankruptcy protection.  This statute was enacted in order to bring some additional expediency to the process in these circumstances.  *See In re LDN Corp.*, 191 B.R. 320 (Bankr. E.D. Va. 1996) (quoting S. Rep. No. 168 103rd Cong., 1st Sess. (1993) ("[t]his amendment will ensure that the automatic stay provision is not abused, while giving the debtor the opportunity to create a workable plan of reorganization.").  By its terms, § 362(d)(3) has strict time limits within which an *actual plan* must be filed.  It also requires that the filed plan "have a reasonable possibility of being confirmed within a reasonable time."

Specifically, § 362(d)(3) provides that a movant is entitled to relief from the automatic stay

---

[6] The Lienholder made clear that there is no hope that it will ever sit down with Ms. Cheung to negotiate a solution, and that she should not seek any relief that depends on such a meeting.

with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

**(A)** the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

**(B)** the debtor has commenced monthly payments that...[7]

In this case, the Debtor did file a plan of reorganization within the time period set forth in the above statute. Specifically, the Debtor's Chapter 11 Plan [dkt. 46] was filed on November 5, 2010 and the Court entered an Order Determining that the Debtor is a SARE case on December 29, 2010 [dkt. 71]. Accordingly, the Debtor satisfied the time requirements by filing a proposed plan of reorganization *before* an order was entered determining that the Debtor is a SARE case.[8] Subsequently, the Debtor filed an Amended Chapter 11 Plan [dkt. 111] on May 24, 2011 and a Second Amended Chapter 11 Plan (the "Second Amended Plan") [dkt. 131] on July 1, 2011. The Debtor filed its companion Second Amended Disclosure Statement (the "Second Amended Disclosure Statement") [dkt. 132] on July 1, 2011. Having satisfied the time requirement, the Court must determine whether the Debtor has satisfied the parallel requirement that the Debtor's proposed plan has a "reasonable possibility of being confirmed within a reasonable time."

---

[7] In this case, it is undisputed that there have been no post-petition payments to the Lienholder.

[8] This is not to suggest that this same result would follow if the Debtor had self-selected as a SARE on its voluntary petition. In such a case, a separate determination of SARE status would not be required and compliance with the earlier 90-day deadline would be mandated by statute.

This prong of the stay relief test is not the same as the strict standard for confirmation of a plan of reorganization.  *See In re Windwood Heights, Inc.*, 385 B.R. 832 (Bankr. N.D. W.Va. 2008).  The Lienholder acknowledged at the hearing, and the Court agrees, that plans of reorganization are not static and are subject to change.  Notwithstanding, the Court believes that the standard for assessing the Debtor's plan with respect to section § 362 (d) (3) must be more exacting than the standard under § 362 (d) (2).

The Second Amended Plan filed in this case is more developed than the plan filed in the companion case. (*See* footnote 4, *supra*).  The Lienholder's primary complaint about the plan are about the types of issues that tend to evolve as the plan moves through the confirmation process.  For example, the Lienholder attacks the proposed plan because certain guarantors are being released under the proposed plan, including Ms. Cheung's father.  This may be a valid confirmation objection, but it is not a reason to bar consideration of confirmation.  In addition, Ms. Cheung stated that the release of the guarantors was not a critical component of the proposed plan.[9]

This Debtor has proposed a plan and a disclosure statement that show how the project will develop into an operable hotel and when the hotel will be able to generate sufficient cash to pay back creditors. The Second Amended Disclosure Statement contains financial exhibits including a reconciliation of claims, projected payments to all creditors and vendors to the time of opening, a projected ten-year profit and loss statement for the Property as the Hotel Indigo, a construction and repair completion budget and a furniture budget.

---

[9] It appears that the release of individual guarantors may not have survived the Second Amended Plan.  The "Injunction Against Certain Actions" set forth in section 10.5 is as to "Affiliates" as that term is defined in section 1.2 to include certain related limited liability corporations.

The Second Amended Plan did not exist in its current incarnation at the time of the hearing on the Lienholder's Motion for Relief from Stay, but the Second Amended Plan and Second Amended Disclosure Statement are an extension and evolution of the then-proposed plan, and are consistent with the facts and evidence that were introduced at the hearing on the Motion for Relief from Stay.[10]  The Second Amended Plan and Disclosure Statement appear to be the product of a great deal of time, thought and effort, and are consistent with the evidence presented in Court at the hearing on this matter.  This Debtor has a clear view of the path it will take to confirmation of a plan and the means to execute that plan. The Court concludes that it is probable that the Debtor can confirm its plan within a reasonable time.

---

[10]  The Debtor has recently filed a Third Amended Chapter 11 Plan [dkt. 148] and an Amended Disclosure Statement in Support of Third Amended Plan [dkt. 149].  Both of these were filed August 23, 2011 and appear to contain few material differences from the Second Amended Plan and Disclosure Statement.

### D. Conclusion

For the foregoing reasons the Motion [dkt. 63] filed by RL BB Financial LLC for Relief from Automatic Stay shall be denied. A separate order will issue.

CC:

James A. Vidmar, Esquire
Logan, Yumkas, Vidmar & Sweeney LLC
2530 Riva Road, suite 400
Annapolis, MD 21401

Louis Ebert, Esquire
Joshua Bradley, Esquire
Rosenberg Martin Greenberg, LLP
25 South Charles St., suite 2115
Baltimore, MD 21201

Office of the United States Trustee
101 W. Lombard St. rm. 2625
Baltimore, MD 21201

**END OF MEMORANDUM**